Good afternoon and may it please the court. Kenneth Hamann raises two issues on appeal. The primary relief he seeks is for a new trial as a result of confrontation clause violations. Alternatively, he seeks a new sentencing hearing based on the erroneous application of the Career Offender Enhancement Guideline. Mr. Hamann was convicted of conspiring with William Davis to possess with intent to deliver 50 grams or more of methamphetamine in about a two week period in February 2020. The government's case relies heavily on testimony provided by Officer Stanley. To establish that the day before Mr. Hamann and Mr. Davis were arrested, Mr. Hamann sold nearly 47 grams of meth to a confidential informant. The problem is that Officer Stanley had no personal knowledge or observation that Mr. Hamann is the person from whom the confidential informant bought the methamphetamine. There was a whole series of violations of the confrontation clause in the scope of his testimony. After he established how the department established credibility of a confidential informant, the prosecutor asked directly, did the DEA set up a controlled buy from Hamann? And Officer Stanley says yes. The problem, as his testimony is unpacked, is that every relationship between the confidential informant and Hamann by name was hearsay to Officer Stanley. This was testimony completely backdoored by the government and is a textbook confrontation clause violation. Mr. Davidson, it seems, as you know, as you've cited, we've had a lot of these cases recently, whether it's a confrontation clause violation when the government says a witness is explaining the investigation. I mean, here it seems that the very first witness is Stanley, and his whole testimony is about, what the government would say is explaining the investigation of what happened with the informant the day before, which you say is the confrontation clause violation. I mean, it strikes me that's unusual. I mean, usually the explaining the investigation is an officer gets on the stand, and there's this beginning part of explaining the investigation, and then gets to something that isn't based on out-of-court statements. For example, what happens when they execute the search. But here, isn't it the case that Stanley's entire testimony is about this explaining the investigation, essentially, in the government's view? Well, that's what the government says. But I think proof is in the pudding that the government relied on the truth of the matter asserted, that the confidential informant purchased from Hamann by name, because Officer Stanley had no personal knowledge of the confidential informant setting up a buy, actually buying it directly from Hamann. And they could have set up context for the investigation in a number of ways, including based on a tip we established a warrant, and that's what brought us to the hotel. Right. I think it's a friendly question. In other words, if it's just to explain the investigation, an agent could go on and say, oh, well, here's why we got to this point, and then let me tell you about what happened when we executed the search. Here, the whole first witness is just supposedly explaining the investigation, but detailing this what happened the day before with the confidential informant who wasn't there to testify. That's right. That's right. And that conclusion that Officer Stanley testified to, that the non-testifying confidential informant obtained directly from Hamann, was not only relied on in the opening statement, it was brought up again when questioning other witnesses, and it was relied heavily by the government during the closing argument, being brought up at least three times to argue the elements of the offense in substance. The harm is profound. The government argues in their brief that this was just a harmless bit of information, but it was relied on so heavily by the government that it is clear that they needed it to prove their elements. Without this testimony by Hamann, the government's charged offense literally doesn't add up. Hamann was busted with 17 grams of meth. It's a conspiracy charge. Under Haynes, a defendant can be sentenced to the penalty level for which he is personally responsible. They needed to prove that the confidential informant got that extra 46 from Hamann. That's a problem. That's actual harm. Even though actual harm is not the standard, but there was actual harm in this case. It also was necessary to prove that there was some sort of inference that the jury could draw that there was more than an arm-length transaction between William Davis and Mr. Hamann. Mr. Davis testified he would have been the perfect witness to provide evidence and testimony that they had conspired to move a large amount of methamphetamine, and that is not the testimony he provided. What he provided was that he was moving a lot of meth. He just happened to drift into town to America's Best Value Inn, and he was selling a lot of meth to a lot of people. When asked how the transactions with Hamann went down, on two different occasions, Mr. Davis says, well, he wanted to buy, I sold him some, and that was it. Didn't Mr. Hamann confess to buying meth from Davis as well? He did. In the recorded statements, he identified buying from Mr. Davis. And had this been only a possession with intent to distribute, we've got a different case. But this is conspiring with William Davis to move more than 50 grams of meth. They still have to establish a conspiratorial agreement to move a large amount. Simply buying, especially in relation to the testimony Davis provided, doesn't do much more than reflect an arm's-length transaction. Hamann's recorded statements also conflict with the testimony Mr. Davis provides. And without the tainted testimony through Officer Stanley, the jury had no context for what Hamann was saying. Some of the agents' interview questions snuck in over defense's objection, but the government painted Mr. Hamann as a liar. Repeatedly, they argued, this guy's a lion through his teeth. The officers on the recorded statement that was entered called him a liar. The prosecutor called him a liar. The prosecutor then said Mr. Davis has no reason to lie. And Mr. Davis only established that on two separate occasions, Mr. Hamann bought about an ounce, and that was it. He asked to buy, Davis sold, and in his words, that was it. That's where the standard for establishing harmlessness with the Confrontation Clause is looking at the tainted evidence and whether there's a reasonable possibility that it might have contributed. And I believe that that very much exists in this case, that there is more than a reasonable possibility that it contributed to the conviction. But we can also see how much that tainted evidence was necessary to clean up very big questions in the government's case to meet their elements. And so we believe that, indeed, there was a very clear Confrontation Clause violation and the government cannot meet its burden of harmlessness. I want to mention briefly that our alternative issue is going to be heard by this panel in greater substance tomorrow. And so for Mr. Hamann, the relief he primarily seeks in this case is for the new trial, but in the alternative, if the court does not grant that relief, would you ask that this case be held in advance until Vargas is decided? Yes, thank you, Ms. Davis. You've saved time for rebuttal. I'm sorry? You've saved time for rebuttal. Thank you, Ms. Davis. Mr. Fowler? Good afternoon, Your Honors, and may it please the court. Charles Fowler for the United States. The challenged testimony in this case breaks down, I think, into two really distinct analytical components that should be treated distinctly. The first is the confidential source tip that Officer Stanley relayed to the jury. That was that Callie, someone named Callie, didn't directly identify the defendant. Someone named Callie was moving multiple ounces of methamphetamine. That testimony was admitted over the defendant's objection. A separate analytically, I think, component is the entire discussion of the controlled buy. Now, the first thing I think that's important to point out about that testimony is that absolutely nothing about the controlled buy was admitted over an objection by the defense. We get the officer's perspective, and of course as we argue in the brief, and I'll touch on this, really the officer is walking through the DEA's own steps in the investigation. So this is not a situation where a source is out in the community and runs into a drug dealer, somehow develops information independently, and then relays it to law enforcement. This entire operation, once we get past the initial tip to the controlled buy, the entire operation is something that the officers have knowledge of because they are the ones orchestrating it. Now, you get through... But they relied on the informant for what happened inside the room because there were multiple people. I mean, you wouldn't have this issue if the defendant had been the only person inside the room. But wasn't it essential that the informant said, the one I got these drugs from was the defendant? So that is... That's the only piece I think that you could say perhaps wasn't based on the officer's own knowledge, but if you just carefully go through the Q&A, you don't see Mr. Hammond as opposed to someone else in the hotel room was the one who handed over the meth. And in fact, the moment it sounded like the officer was about to actually explain something that happened inside the hotel room, that is the first point in the whole discussion of the controlled buy where you get an objection, and that objection is sustained. So you don't get that at all. A few pages later, and this is at... I think this is at ROA 503, 504, and then a few pages later at ROA 507, there's a question without saying what the source told you, how do you have an understanding of why he came back with a little bit of the money you gave him, and you get an objection there, and that objection was sustained. Those are the only two times there was an objection to the discussion of the controlled buy because those are the only two times where the witness, where either the question elicited or the witness seemed to be about to say something that actually happened inside the room, and that's also exactly how the controlled buy was argued to the jury in closing. This is at ROA 706, 707. What do you do about the tip, which there was a motion in limine, I mean, that was objected to at trial, objected to pretrial, that Callie was dealing meth, and it was apparent Callie was the defendant, that became apparent, so how do you deal with that? Well, I think, for one thing, the tip falls squarely under the explaining the investigation rationale, and I direct the court to its 1994 decision in United States v. Carrillo, which I think is really spot-on to this case. Someone identified a drug seller out in the community by a nickname. This court said it took additional sort of extrinsic information to link that tip to the defendant, and this court said that that was not directly inculpatory enough of the defendant to outweigh its value in explaining the investigation. If it was just for explaining the investigation and not for the truth of the matter or for its inculpatory value, why did Stanley, the beginning of Stanley's testimony is focused on proving up the reliability of the informant? I mean, he talks about how the informants get vetted, you know, these aren't just random people off the streets. I mean, to me, when you're vouching for someone's reliability, that's because you want the jury to think what the person, the informant said is true. Well, you know, I think there's, you know, there's something to that. Of course, the prosecutor, you know, at the time, he's got the burden beyond a reasonable doubt. He's doing everything he can to make sure that what's put before the jury is going to be believed, certainly. But I think the tip... Believed for the truth. That's what you're trying to show, the tip was true. You're trying to show it was a reliable source. If it's just explaining the investigation, you can say, oh, you know, a note came to our office. I don't know who it was from, but that led us to investigate the defendant. I mean, that's explaining the investigation. We received information... I mean, as Judge Duncan said in his dissent, as I wrote in the sharp, you can easily just say, we received information that caused us to look at this defendant who we knew at the time was at this motel. Sure, Your Honor. I think the prosecutor certainly could have elected to do it that way. Having done it the way he did it, I think given that the tip itself didn't directly inculpate the defendant, just like the tip in Carrillo. But regardless, I'll turn it into harmlessness. Because I think this court's decision in Sarli clearly controls on the issue of harmlessness. And the court there focused on, as I read the opinion's analysis, focused on really two aspects of the challenged hearsay. One, that the testimony that was challenged was redundant of other evidence. And second, that it proved only facts that were themselves essentially undisputed. And I think those two things are true here as well. How do you square the sort of sufficiency argument, it's redundant, it's cumulative? Assume that, but isn't our standard that there's no reasonable possibility that the tainted evidence, not like the overall mix of evidence, might have contributed to the verdict? That is the standard, Your Honor. How do you square that? Frankly, the same way the court squared it in Sarli. It's, you know, we're not dealing... It's got to be a reasonable possibility. I can't remember. In Sarli, was the evidence emphasized in closing and opening? It was, actually. It was referenced in both opening and closing. I would point out, again, keeping these two sort of analytically distinct things distinct, here, the tip, which I think, frankly, is perhaps more problematic for the government, was never referenced other than in that one moment in Officer Stanley's testimony. It was one Q&A in the entire context of a two-day trial. The tip was out there. It was never discussed again. The controlled by, which I think, again, the officer really established based on his own personal knowledge, that was referenced in opening briefly. The prosecutor explained there was going to be evidence of a controlled by. That was discussed in closing again, as well. But it was completely redundant of the defendant's own confession. So you have the defendant... Why put it in this case and risk where we're sitting right now? Well, you know, Your Honor, I... I frankly don't think it was terribly risky for the officer to explain the operation that the officers themselves had orchestrated. Fair enough. What of counsel officers' point, though, that the only way you get above 50 grams is via the confidential informant? So I think there were actually... Is that accurate? I'm sorry? Is that accurate? I do not believe it's accurate, Your Honor. And for one thing, the defendant's confession went well beyond just the drugs that were either sold to the informant or found on the defendant and his co-defendant on the day of the search warrant. He confessed to some other amounts which the court... the district court expressly ruled were intrinsic to the charged conspiracy that the defendant had moved earlier... Just talking about, like, the prior summer? Exactly, Your Honor. This is two... The defendant confessed to buying and moving two one-ounce amounts through someone named Chad Weaver, and this is all at ROA 591, and four one-ounce amounts through someone named James Drake. So we're talking about 28... 28 grams per ounce. That's six ounces right there. And several different rulings of the court that are not challenged on appeal expressly included those within the scope of the conspiracy. So we've got those amounts. We've got not only the 22 grams that ended up being something like 17 grams pure found in the truck the defendant was standing by on the day the search warrant was executed, but you've also got the 166 grams that ended up being something like 141 pure, 144 pure, that were in the co-defendant's backpack. And as the prosecutor argued without objection during closing, if you've got an agreement, established a conspiracy between those two, the defendant is responsible for all of it. So we've got six... something north of 10 ounces, so many times over what would be required to reach the 50-gram level even without... But the conspiracy can't be that he was just a user buying, right? It has to be that he was basically then selling it. He was the top. Haman's here buying it and then selling it to others. What's the conspiracy theory? So the theory was basically that once you've got someone buying large quantities for resale, he is participating in a conspiracy. And of course, the government can establish that through circumstantial evidence, the amounts themselves, both law enforcement witnesses testified that anything over about 5 grams is... Again, we're talking ounces and ounces here. Anything over about 5 grams is likely an amount that the defendant is acquiring for resale. You've got, again, the defendant confessing to multiple sales. He confessed not only to the sale, by the way, to the confidential informant, but he was asked, okay, when did you sell before that? And he said, just a little bit earlier, I sold about a quarter of an ounce to somebody who came by looking for that. And so we've got... And it's not really disputed. That's the other point that this court emphasized in its analysis in Sarli, which was the fact that he was selling was not really disputed. The only offense element that the defense tried to contest either in opening statement or in closing argument was whether the government had established a conspiracy. But the challenged testimony really establishes undisputed facts. The parties could debate and did debate whether the various facts that were put in evidence supported a jury inference of a conspiracy. But the facts themselves that the challenged testimony proved were not disputed. They were proved up through multiple alternative avenues, including the defendant's own confession. They were corroborated by the co-defendant's testimony who testified consistently with the defendant that he had been the one who provided the meth earlier in the week. And beyond that, again, the amount that the defendant sold to the confidential informant in itself was neither necessary nor sufficient to reach the 50 level, but was really relatively unimportant in the grand scheme of what was shown to the jury of these ounces and ounces that the defendant had moved over the course of the conspiracy, which was all ruled by the district court to be intrinsic to the conspiracy. So I think really there are no confrontation problems, particularly with the unobjected to testimony about the control buy. Even if there were, there's no reasonable possibility that it affected the verdict. And if the court has nothing further. I have a question. Do U.S. attorney's offices still have in-house COEs for all the prosecutors? Yes, your honor. Because I'm surprised we've had so many cases in the last five years or so with this issue of the confrontation clause and whether it applies when the government says they're using out-of-court statements for the background of the investigation. And whether you prevail or not today, because of this issue, you're at least having to come to New Orleans. So it just seems like something is not getting through to the people out there prosecuting the cases if we're dealing with, almost every year we've had one of these cases. And so I'm just, I guess I don't know if it's been discussed or not, but it seems like it should be. I understand, your honor. I don't have a great, I'm relatively new to the office. I started just a few weeks ago here in the Western District, so I don't have a . . . I understand the court's concern. And they would say, you know, last year, here's the problems in cases. Here's what the Fifth Circuit said. These were the problems in criminal trials. And so with the hope that the problems weren't repeated. But anyway . . . I do understand the court's concern. Thank you, Mr. Fowler. Thank you. Mr. Davidson. Any further comment? Mr. Hammond's vague statements about drugs may contribute to a sentencing calculation, but in terms of proving beyond a reasonable doubt of the crime charge, the government needs to prove up the drugs. And without the confidential informant, they had 17 grams attributed to him. As for preservation, this was a hotly contested issue. First of all, the government's response does not challenge that this was a preserved issue. And the motion in limine argues beyond just the tip, but the substance of testimony derived from a confidential informant citing Taylor and Cain, Kizzee, Jones, Alvarado, Valdez, and the court granted it completely and said to the parties, and the court granted that motion in limine, page record cites 352, 353, talk to the court before going in this direction. And the prosecution didn't. Right. So why wasn't that brought up, that the motion in limine was violated? Because they should have gone, you know, sidebar, Your Honor, or we actually do want to bring it up now. And that . . . I didn't see that the defense counsel said, whoa, they're breaking the motion in limine ruling. Good question. I think when we look at the whole of the record, this is a hotly contested issue that was anticipated by defense counsel. They tried their best with motion in limine. They got it granted. They may not have been able to lodge an objection every single time a violation occurred. But at some point, the government was allowed to ring the bell. And it does become a strategy issue of whether or not you interrupt the flow of trial every single time when the court has made a definitive ruling. The court did sustain objections when it was, what did this person say? Well, that's a red flag trigger for sure of hearsay. But that's why this court has said, it doesn't have to be a formalistic statement that violates the Confrontation Clause, but the substance of the testimony. And the prosecutor went right for the conclusion. Did the confidential informant buy from Mr. Hammond? And Officer Stanley says yes. At that point, the subsequent testimony and various points at which this comes up again, there's, I think, a good faith attempt to try and preserve this the best they can. But it's clearly an issue that was put before the district court, and the district court overruled the objection. As to harmlessness in Sarley, the statements in closing argument were referred to as fleeting statements by the prosecutor. In this case, the prosecutor brings up the confidential informant's sale at least three different times. I don't know how to judge time on paper, but the discussion lasts several pages of mention. As for Mr. Hammond's confession, there were just two clips that were offered to the jury. And those are not the pillar of clarity that the government wants you to believe. When asked about the sale yesterday, Mr. Hammond doesn't come out and say, oh yeah, I sold two ounces to this person. He simply says, someone came around yesterday looking for two ounces. He does actually admit to selling about a quarter of an ounce, but we don't know when, we don't know to whom, we don't know from whom he got that amount of meth. We also have the fact that Davis does know a thing or two about selling meth. He was selling a lot of it, and he testified that users sometimes buy about an ounce. It may not be the usual purchase for a user to buy that amount, but it does happen. And he also testified that he sold the amount that Mr. Hammond was caught with on the 25th, which was 17 grams. It's not an ounce. So these estimations are nothing but that compared to what the government was able to prove. And so to prevent the court from having to reweigh the evidence, which is the prerogative of the jury, I do believe that the harmless standard was not met by the government, and Mr. Hammond is entitled to a new fair trial. Thank you very much. Thank you, Ms. Davidson. Case is under submission. Next case for today, Sentry Select Insurance.